No. 24-369

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

VIKRAM VALAME,

*Plaintiff-Appellant*,

v.

JOSEPH R. BIDEN, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:23-cv-03018-NC
Hon. Nathanael Cousins

_____

**APPELLANT'S REPLY BRIEF**

_____

Vikram Valame
*Pro Se*
4039 2nd Street, Palo Alto, California
(208) 994-3067
vik.valame@gmail.com

*Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................... 2

I.  This Court Should Vacate and Remand Without Reaching Any
Article V Questions........................................................................ 2

    A.   The Government Concedes That the Decision Below was
    Incorrect.................................................................................. 2

    B.   This Court Should Not Consider the Deadline's
    Effectiveness in the First Instance ................................... 3

II. The Ratification Deadline Has No Legal Effect ......................... 7

    A. The Text Contradicts a Congressional Deadline-Setting
    Power ..................................................................................... 8

    B. History Contradicts a Congressional Deadline-Setting
    Power ..................................................................................... 16

    C. Tradition Contradicts a Congressional Deadline-Setting
    Power ..................................................................................... 22

    D. Precedent Does Not Support a Congressional Deadline-
    Setting Power........................................................................ 26

CONCLUSION ................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

*Alaska Dep't. of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177 (9th Cir. 2023) ................................................................................ 4

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ................................................................................... 32

*Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022) ........................ 3

*Badea v. Cox*, 931 F.2d 573, 575 n.2 (9th Cir. 1991) ..................... 5

*Braidwood Mgmt. v. Becerra*, No. 23-10326 (5th Cir. June 21st, 2024) .... 5

*Burgess v. United States*, 553 U.S. 124, 130 (2008)........................ 10

*Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020) .................... 20, 24

*City of Los Angeles v. County of Kern*, 581 F.3d 841 (9th Cir. 2009) ....... 5

*Clinton v. City of New York*, 524 U.S. 417, 439 (1998) .......................... 12

*Coleman v. Miller* 307 U.S. 433 (1939)......................................... 31

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, No. 22-448 (U.S. May. 16, 2024) ................................................. 12, 13

*Dames Moore v. Regan*, 453 U.S. 654 (1981)........................................ 24

*Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014)............ 3, 4

*Detrich v. Ryan*, 740 F.3d 1237, 1248–49 (9th Cir.2013) (en banc) ......... 3

*Dillon v. Gloss*, 256 U.S. 368 (1921) .................................... 7, 9, 27, 28, 33

*Dream Palace v. County of Maricopa*, 384 F.3d 990 (9th Cir. 2004) ....... 4

*Dubin v. United States*, 143 S. Ct. 1557, 1573 (2023) ............................ 16

*Ecological Rights v. Pac. Lumber*, 230 F.3d 1141 (9th Cir. 2000) ........... 3

*Egbert v. Boule*, 142 S. Ct. 1793, 1804 (2022) ........................................ 33

*Free Enterprise Fund v. Public Company*, 561 U.S. 477, 505 (2010)..... 23

*Haaland v. Brackeen*, No. 21-376, 25 n.4 (U.S. Jun. 15, 2023) ........ 12, 13

*Harrington v. Purdue Pharma*, No. 23-124, 18 (U.S. Jun. 27, 2024)..... 15

*Hawke v. Smith*, 253 U.S. 221, 227 (1920)................................................. 8

*Hollingsworth v. Virginia*, 3 U.S. 378, 382 n._ (1798)........................... 13

*Humphrey's Executor v. U.S.*, 295 U.S. 602, 627 (1935) ...................... 16

*Illinois v. Ferriero*, 60 F.4th 704, 717 (DC. Cir. 2023)........................... 6

*INS v. Chadha*, 462 U.S. 919, 955 (1983) ............................................. 14

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003). 5

*Mandel v. Bradley*, 432 U.S. 173 (1977)................................................. 34

*Martin v. Hunter's Lessee*, 1 Wheat. 304, 326 (1816) ........................... 12

*Maslenjak v. United States*, 137 S. Ct. 1918, 1931 (2017)...................... 6

*McCalla v. Royal MacCabees Life*, 369 F.3d 1128 (9th Cir.2004).......... 30

*Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1035 (9th Cir. 2014) 4

*Moore v. United States*, 871 F.3d 72 at 79 (1st Cir. 2017)....................... 3

*N.O.W. v. Idaho* 459 U.S. 809 (1982)....................................................... 34

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843 (U.S. Jun. 23, 2022) ................................................................................................ 22

*NLRB v. Noel Canning* , 573 U.S. 513, 557 (2014) ................................. 24

*Official Committee v. Coopers Lybrand*, 322 F.3d 147 (2d Cir. 2003) ..... 5

*Planned Parenthood v. Department of Health and Human Services* 946 F.3d 1100 (9th Cir. 2020).......................................................................... 6

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995).................... 22

*Prestige Transp. v. U.S. Small Bus. Admin.*, No. 21-56129, 6 (9th Cir. Feb. 17, 2023) (unpublished) .................................................................... 4

*Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) ................................ 5, 7

*Raines v. Byrd*, 521 U.S. 811, 823 (1997) ............................................... 32

*Roth v. Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023) .............. 4

*Rubin v. United States*, 449 U.S. 424, 430 (1981)................................... 16

*Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) ...................................... 10

*Siegel v. Fitzgerald*, 142 S. Ct. 1770, 1779 (2022) ................................. 15

*Singleton v. Wulff*, 428 U.S. 106, 121 (1976)............................................ 4

*Soto-Soto v. Garland*, 1 F.4th 655, 663 n.3 (9th Cir. 2021)..................... 2

*Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) .................................... 10

*The Pocket Veto Case* , 279 U.S. 655, 689 (1929) .................................... 24

*Torres v. Madrid*, 141 S. Ct. 989, 1005 (2021) ....................................... 29

*United States v. Munsingwear*, 340 U.S. 36, 41 (1950) ......................... 34

*United States v. Pollard*, 20 F.4th 1252, 1261 (9th Cir. 2021).............. 30

*United States v. Rahimi*, No. 22-915, 40 n.2 (U.S. Jun. 21, 2024)... 16, 26

*United States v. Sprague* 282 U.S. 716, (1931) ....................................... 30

*Wisconsin Dept. of Revenue v. Wrigley Co.*, 505 U.S. 214 (1992) ........... 34

## STATUTES

1 Stat. 402 (1794)...................................................................................... 25

1 Stat. 97 (1789)........................................................................................ 25

1 U.S.C. §1 ................................................................................................ 24

12 Stat. 251 (1861).................................................................................... 26

13 Stat. 567 (1865).................................................................................... 26

14 Stat. 358 (1866).................................................................................... 26

15 Stat. 346 (1869)................................................................................ 26

2 Stat. 306 (1803).................................................................................. 26

2 Stat. 613 (1810).................................................................................. 26

36 Stat. 184 (1909)................................................................................ 26

37 Stat. 646 (1912)................................................................................ 26

40 Stat. 1050 (1917).............................................................................. 26

41 Stat. 362 (1919)................................................................................ 26

43 Stat. 670 (1924)................................................................................ 26

47 Stat. 745 (1932)................................................................................ 26

48 Stat. 1749 (1933).............................................................................. 26

61 Stat. 959 (1947)................................................................................ 26

92d Cong., 86 Stat. 1523 (1972) ........................................................... 11

# OTHER AUTHORITIES

1 The Records of the Federal Convention of 1787, at 202-203 (Max Farrand ed., 1937) ................................................................................ 17

101 Cong. Rec. 6628 (1955) .................................................................. 23

116 Cong. Rec. 35959 (1970) ................................................................ 24

75 Cong. Rec. 3856 (1932) .................................................................... 23

Effect of 2020 OLC Opinion on Possible Cong. Action Regarding Ratification of the Equal Rights Amendment, 46 OP. O.L.C., slip op. at 2-3 (2022), https://perma.cc/H4ZS-GP3G ........................... 6, 9, 25

Federalist No. 37 (Madison)................................................................... 24

H.R. Rep. No. 95-886 at 7 (1978) .......................................................... 23

Michael S. Paulsen, A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment, 103 Yale L.J. 677, 687 (1993) ........................................................................................... 28

National Archives, Equal Rights Amendment – List of State Ratification Actions (Mar. 4, 2020), https://perma.cc/6K4F-WC9E ..... 9

Ralph Martig, Amending the Constitution, 35 Mich. L. Rev. 1253, 1253 (1937) ................................................................................................. 20

Samuel Johnson, A Dictionary Of The English Language (London, J.F. & C. Rivington et al., 10th ed. 1792).................................................. 11

The Documentary History of the Ratification of the Constitution ("DHRC") 1374 (Jensen & Kaminski eds.), available at https://digital.library.wisc.edu/1711.dl/Constitution. ......................... 18

v

The Federalist No. 39 (Madison .................................................... 16
The Federalist No. 45 (James Madison)..................................... 12

## RULES

F.R.C.P. 15(d)................................................................................. 7

## TREATISES

1 Joseph Story, Commentaries on the Constitution of the United States
    191-205 (1833)....................................................................... 18
Akhil Amar, *America's Constitution* 417-19 (2006) ................................ 25

## CONSTITUTIONAL PROVISIONS

Mass. Const. of 1780, pt. 2, ch. 6, art. X................................. 20
Md. Const. of 1776, LIX ............................................................. 20
N.H. Const. of 1784, pt. 2 .......................................................... 20
Pa. Const. of 1776, § 47 ............................................................. 20
S.C. Const. of 1778, XLIV .......................................................... 20
U.S. Const. Amend. X................................................................ 12
U.S. Const. Amend. XX §5 ........................................................ 26
U.S. Const. Art V........................................................................ 10
U.S. Const. Art. I §8 cl. 18......................................................... 13
U.S. Const. Art. V. ........................................................ 9, 10, 11, 18, 21
Vt. Const. of 1786, ch. 2, XL....................................................... 20

# INTRODUCTION

The validity of the Equal Rights Amendment and its legal effect on the Selective Service System are complex questions of profound importance. However, this is a Court of review, not first view. Defendants concede that the district court never analyzed the relevant Article V questions and committed reversible procedural error. Instead of reaching out to decide major constitutional issues of first impression, this Court should adhere to its ordinary procedures and vacate the decision below.

If this Court is inclined to rule on Equal Rights Amendment's status in the first instance, it should hold that there was no time limit to ratify the amendment. The ERA has satisfied the text of Article V, which includes no deadline (implicit or explicit) for the ratification of amendments, and no authorization for Congress to create one. While the text alone is sufficient to decide this case, history, tradition, and precedent also confirm that bare majorities in Congress have no independent authority to modify the detailed Article V process. That power is reserved to the People of the United States alone.

1

## ARGUMENT

### I.  This Court Should Vacate and Remand Without Reaching Any Article V Questions

#### A. The Government Concedes That the Decision Below was Incorrect

The government states that "[t]he status of the ERA does not depend on the Archivist's action or inaction." Appellees' Brief at 18. Appellant agrees with this statement, which directly contradicts the district court rationale for dismissing this case: "The Archivist has not taken those necessary steps" to bring the ERA into existence. ER-91. The government has confessed error.

Additionally, the government does not mention, much less answer, the party presentation argument raised in Appellant's opening brief. *See* Appellant's Brief at 21-24. "In general, appellees waive issues that they fail to raise in their answering brief." *Soto-Soto v. Garland*, 1 F.4th 655, 663 n.3 (9th Cir. 2021) (collecting cases). Violation of the party-presentation rule is thus an independent procedural error.

Because the district court did not make any alternate holdings supporting dismissal of the ERA claims, either of these mistakes justifies vacatur of the decision below.

## B. This Court Should Not Consider the Deadline's Effectiveness in the First Instance

1. The government argues that this Court should be the first court in the nation to rule on whether Congress can unilaterally impose deadlines on the ratification of constitutional amendments. The government's invitation disregards this Court's usual practice and would short circuit judicial deliberation when it is needed the most.

"Typically, a federal appellate court does not consider an issue not passed upon below." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014) (internal quotations omitted). This rule exists for a reason: "it is a better procedure to have the district court make a ruling on the merits in the first instance, as the district court's views can only help our court to resolve the difficult issues presented." *Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022).[1]

---

[1] *See also Moore v. United States*, 871 F.3d 72 at 79 (1st Cir. 2017) (explaining that consideration by the district court "enhances the quality of our decisions"); *Detrich v. Ryan*, 740 F.3d 1237, 1248–49 (9th Cir.2013) (en banc) (plurality opinion) (remanding a habeas petition even after sustained merits consideration on appeal); *Ecological Rights Foundation v. Pac. Lumber*, 230 F.3d 1141, 1154 (9th Cir. 2000) ("Our judicial system generally assumes that consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result.")

To be sure, appellate courts have the discretion to decide questions in the first instance. But that discretion must only be exercised where special circumstances warrant it. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). These circumstances include when "proper resolution is beyond any doubt" and when "injustice might otherwise result." *Ibid.* Even when a question is "purely legal", this court "must still decide whether the particular circumstances of the case overcome our presumption against hearing" such issues. *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004).

The Ninth Circuit and other courts of appeal consistently apply the presumption when a pure question of law "raises a question of first impression in this circuit and requires resolution of complicated issues." *Alaska Dep't. of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1183 (9th Cir. 2023).[2] This rule is particularly important when a question of

---

[2] *See also Roth v. Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023) (remanding a "potentially dispositive" issue of statutory interpretation); *Prestige Transp. v. U.S. Small Bus. Admin.*, No. 21-56129, 6 (9th Cir. Feb. 17, 2023) (unpublished) ("Because this is a significant issue of first impression, we remand to the district court to analyze it in the first instance"); *Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1035 (9th Cir. 2014) (remanding "complicated issues of statutory interpretation and administrative law of first impression in this circuit"); *Davis*, 755 F.3d at 1095 (remanding because "the resolution of the issue is not

law, like the question in this case, is of "high stakes and constitutional import." *Braidwood Mgmt. v. Becerra*, No. 23-10326 (5th Cir. June 21st, 2024); *see also City of Los Angeles v. County of Kern*, 581 F.3d 841, 846 (9th Cir. 2009) (holding that the "rule against unnecessary constitutional adjudication applies" even where the trial court has not considered a nonconstitutional basis for decision).

2. The government does not identify any special circumstances which overcome the presumption against deciding questions in the first instance. None exist.

Firstly, the scope of Article V is far from "beyond debate". The government itself acknowledges that "important questions about Congress's role in the amendment process" are "complex and unsettled". Effect of 2020 OLC Opinion on Possible Cong. Action Regarding

---

clear"); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1039 (D.C. Cir. 2003) ("sufficient public importance and complexity" weigh "strongly against deciding" deciding questions on appeal); *Official Committee v. Coopers Lybrand*, 322 F.3d 147, 159-161 (2d Cir. 2003) (remanding "pure issues of law" surrounding applicability of the pari delicto defense which were "far from beyond any doubt"); *Badea v. Cox*, 931 F.2d 573, 575 n.2 (9th Cir. 1991) (remanding "questions of first impression in our circuit"); *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986) ("The crucial factor, then, appears to be whether the resolution of either of these issues is clear").

Ratification of the Equal Rights Amendment, 46 OP. O.L.C., slip op. at 2-3 (2022), https://perma.cc/H4ZS-GP3G; *see also Illinois v. Ferriero*, 60 F.4th 704, 717 (DC. Cir. 2023) ("[a]s a matter of the plain meaning" an anti-deadline "textual interpretation is not without force"). The constitutional question presented is a far cry from the "simple and straightforward" questions of statutory interpretation occasionally decided on appeal. *Planned Parenthood v. Department of Health and Human Services* 946 F.3d 1100, 1112 (9th Cir. 2020).

A remand would not create injustice through delay. Delay is "unnecessary" when "the resolution is beyond doubt". *Ibid.* Otherwise, delay is merely a feature of a judicial system that values considered decision-making over a rush to judgement. *Maslenjak v. United States*, 137 S. Ct. 1918, 1931 (2017) (Gorsuch, J., Concurring) ("the crucible of adversarial testing [...] could yield insights (or reveal pitfalls) we cannot muster guided only by our own lights"). The government has not identified any concrete harm that would be caused by a remand. Any

impact of delay on Valame would be mitigated because Valame himself is requesting that this court remand. *See Quinn*, 783 F.2d at 814. [3]

## II.  The Ratification Deadline Has No Legal Effect

The Constitution does not authorize Congress to unilaterally impose deadlines on proposed Constitutional amendments. The text says nothing about deadlines, even as it specifies constraints on the amendment process with extraordinary detail. Founding Era history and centuries of practice also demonstrate a lack of Congressional deadline-setting power.

The government's only substantial counterargument rests on out-of-context dicta from *Dillon v. Gloss,* 256 U.S. 368 (1921). But *Dillon* dealt with a deadline that had been ratified by three-fourths of the states, one which gained its authority not from Congress but from the Constitution. The deadline attached to the ERA was never ratified by the states and cannot alter the amendment process. *Dillon* has no effect on this case.

---

[3] Remand could resolve any lingering doubts about Plaintiff's Article III standing. Plaintiff is in the process of exhausting his Title VII administrative remedies. On remand, he could file a supplemental complaint under F.R.C.P. 15(d) raising Title VII claims for money damages.

## A. The Text Contradicts a Congressional Deadline-Setting Power

1. The Constitution defines a highly detailed amendment process, one that includes substantive and procedural requirements that must be met before any change is made to the supreme law of the land. See Addendum.

Article V creates three procedural steps that must be followed before an amendment is included in the Constitution. First, an amendment must either be proposed by two-thirds of each house of Congress or proposed in a Convention called for by two-thirds of the states. Second, proposed amendments must be ratified by three-fourths of the states. Third, such ratifications must be in accordance with "the one or the other Mode of Ratification" as "may be proposed by the Congress". *Ibid.* These procedural steps are the exclusive means of amending the Constitution; "It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed." *Hawke v. Smith*, 253 U.S. 221, 227 (1920).

In contrast to the rigid amendment procedure, the Constitution imposes only two constraints on the *content* of amendments: an expired prohibition protecting the slave trade, and a requirement that any

amendment destroying equality of representation in the Senate be approved by every state. The negative inference from these provisions is that Article V "invest[s] Congress with a wide range of power in proposing amendments" subject only to these textual limits. *Dillon* 256 U.S. at 373.

2. The ERA satisfies both the substantive and procedural requirements of Article V. It was approved by two-thirds of each House of Congress. 92d Cong., 86 Stat. 1523 (1972). It has been ratified by three-fourths of the states. National Archives, Equal Rights Amendment – List of State Ratification Actions (Mar. 4, 2020), https://perma.cc/6K4F-WC9E. Those ratifications were by state legislatures, in accordance with the mode of ratification chosen by Congress. *See Ratification of the ERA,* slip op. at n.6-7.

3. The government does not contest any of this. Instead, it argues that the deadline represents "a proper exercise of Congress's power to set the mode of ratification for a proposed constitutional amendment". Appellees' Brief at 13. To win this case, the government must demonstrate that the power to select "the one or the other Mode of Ratification" includes the power to set a ratification deadline. U.S. Const. Art. V. The government fails.

The Constitution has defined what the phrase "Mode of Ratification" means: ratification by "the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof". U.S. Const. Art V. The Constitution refers to this binary choice as "the one or the other". *Ibid.* These specific references clearly define the term "Mode of Ratification", and when a term is defined, that definition is "virtually conclusive", even if the definition varies from the term's ordinary meaning. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019).

This conclusive definition necessarily excludes any purported modes of ratification that are not ratification by legislatures or ratification by states. The Supreme Court has held that where a definition uses definite language (as opposed to the word "includes"), a definition generally excludes what is not mentioned. *See Burgess v. United States*, 553 U.S. 124, 130 (2008). While *Burgess* involved the word "means", Article V is perhaps even more explicit because of the phrase "the one or the other Mode of Ratification". U.S. Const. Art. V. "The consistent use of the definite article…indicates that there is generally only one" mode covered by each of "the one" or "the other". *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004).

Even if Article V did not define "mode of ratification", that phrase would not include the power to specify when an amendment is adopted. Founding-era dictionaries define "mode" as "manner, method, form, fashion", with "method" being defined as "the placement of several things or performing several operations in the most convenient order". See Samuel Johnson, A Dictionary Of The English Language (London, J.F. & C. Rivington et al., 10th ed. 1792). This definition does not make any reference to the speed of "operations", but instead to their "form" or "order". This reinforces the overall point that "Mode of Ratification" refers only to the two methods listed—which go to the form of ratification—rather than any temporal limitations unrelated to form.

The government's argument is also flawed because Article V unambiguously declares *when* a proposed amendment becomes effective: "when ratified". U.S. Const. Art. V. To the extent that Article V has anything to say about a time for adoption, it ties that time to state ratifications, *not* a specific deadline.

Even if Article V was silent or ambiguous as to what counted as a "Mode of Ratification", Congress "can claim no powers which are not granted to it by the Constitution, and the powers actually granted must

be such as are expressly given or given by necessary implication." *Martin v. Hunter's Lessee*, 1 Wheat. 304, 326 (1816). There is no express grant or truly "necessary" implication of a deadline-setting power in the text of Article V. If the Constitution is silent here, that silence may be construed "as equivalent to an express prohibition" on an unmentioned federal power. *Clinton v. City of New York*, 524 U.S. 417, 439 (1998); U.S. Const. Amend. X; The Federalist No. 45 (James Madison).

Finally, the government's argument cannot be squared with the text because it "offers no explanation for *why* Congress's powers" allow it to impose a deadline on the ratification of amendments. *Haaland v. Brackeen*, No. 21-376, 25 n.4 (U.S. Jun. 15, 2023). More compelling (though erroneous) arguments developed by the government are based in history, tradition, and dicta from decisions of the Supreme Court. But the government "never offers a competing understanding of what the word '[Mode]' means". *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, No. 22-448, 23 (U.S. May. 16, 2024). If the government does not "connect[] its summary of history back to the word" mode, then it has

offered no competing interpretation of the text, and must lose.[4]

4. At times, the government suggests that the deadline is authorized not as a "mode of ratification", but instead an "incident" to the mode of ratification. Appellees' Brief at 18. This theory does not solve any of the government's textual problems.

Firstly, there is no textual source of "incidental" Article V powers. The usual source of incidental authority comes from the Necessary and Proper Clause, which allows Congress "to make all Laws which shall be necessary and proper" for executing the Constitution. U.S. Const. Art. I §8 cl. 18. But the Constitution uses "Law" in Article I to include only "ordinary cases of legislation", subject to bicameralism and presentment, *not* the "proposition, or adoption, of amendments to the Constitution". *Hollingsworth v. Virginia*, 3 U.S. 378, 382 n._ (1798).[5]

Secondly, incidental Article V powers are particularly anomalous

---

[4] Although *Brackeen* and *Community Financial Services* both upheld challenged statutes against constitutional challenges, that was because the government offered an account of what the relevant constitutional text meant, while the plaintiffs had none. In this case, the government has no definition of what a "Mode of Ratification" is. Plaintiff does; "Mode of Ratification" means only ratification by state legislatures, or by state conventions.

[5] The government waived reliance on the Necessary and Proper Clause in its briefing below. *See* Defendant's Reply (Dkt. 47) at 2.

because they can be exercised by bare majorities in Congress without approval by the states or presentation to the president. This is contrary to the rule that "when the Draftsmen sought to confer special powers on one House, independent of the other House, or of the President, they did so in explicit, unambiguous terms" *INS v. Chadha*, 462 U.S. 919, 955 (1983). These "narrow, explicit, and separately justified" areas usually have their own "alternative protections", like supermajority requirements. *Id.* at 956, n.21. According to the government, incidental Article V powers have no explicit textual basis, and no alternate protections. That is irreconcilable with *Chadha* and the broader constitutional structure.

Thirdly, no amount of incidental power can negate the exclusive definition of "Mode of Ratification" found in Article V. As the Supreme Court has explained in the bankruptcy context: "The Court has never suggested … that the Necessary and Proper Clause permits Congress to circumvent the limitations set by the Bankruptcy Clause … by enacting legislation pursuant to other grants of authority." *Siegel v. Fitzgerald*,

142 S. Ct. 1770, 1779 (2022);[6] *See also Harrington v. Purdue Pharma*, No. 23-124, 18 (U.S. Jun. 27, 2024) (limiting a broad grant of incidental authority when it would authorize actions "usually reserved for the debtor alone."). The same logic applies to Article V. The Constitution gives Congress the power to propose exactly two modes of ratification, and expressly declares that amendments are adopted when ratified. Adding more modes or changing the timeline for adoption under the guise of an incidental power is not permitted.

Finally, the government does not offer any account of what "incidental" powers are conferred by Article V. How would a court determine what incidental powers that Congress can properly exercise, and those it cannot? The justifications underlying a deadline could easily justify numerous baseless additions to the amendment process, such as mandatory waiting-period, or specific legislative procedures to be used when ratifying amendments. The Supreme Court has consistently refused to expand federal power based on a promise to act responsibly, and this Court should do the same here. *Dubin v. United States*, 143 S.

---

[6] This is true even though the Bankruptcy Clause is framed as an affirmative grant of power "to establish uniform laws on the subject of Bankruptcies". U.S. Const. Art. I §8, cl. 4.

Ct. 1557, 1573 (2023).

5. The text unambiguously establishes that a deadline is not an Article V "Mode of Ratification". Where the text is clear, "judicial inquiry is complete." *Rubin v. United States*, 449 U.S. 424, 430 (1981). This Court should not consider history,[7] tradition,[8] or non-binding dicta[9] if the text alone refutes the government's argument.

## B. History Contradicts a Congressional Deadline-Setting Power

1. Founding-era evidence demonstrates that Congress was granted a narrow role in the amendment process. Rather than vesting Congress with broad power to "impose ratification conditions" on amendments, the amendment process was designed to be "neither wholly national nor wholly federal." *Compare* Appellees' Brief at 15-16 *with* The Federalist No. 39 (Madison). At the constitutional convention, George Mason

---

[7] *United States v. Rahimi*, No. 22-915, 40 n.2 (U.S. Jun. 21, 2024) (Kavanaugh, J., Concurring) ("The historical approach applies when the text is vague. But the text of the Constitution always controls")
[8] *Rahimi*, at 61 (Barrett, J., Concurring) ("evidence of "tradition" unmoored from original meaning is not binding law")
[9] *Humphrey's Executor v. U.S.*, 295 U.S. 602, 627 (1935) ("general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision")

specifically worried that Congress would "abuse their power, and refuse their consent on that very account." 1 The Records of the Federal Convention of 1787, at 202-203 (Max Farrand ed., 1937).

Mason's objection reflected common sentiment. Indeed, seven state delegations voted that "provision ought to be made for (hereafter) amending the system now to be established, without requiring the assent of the Natl. Legislature.". *Id.* at 121-122, 194; *see also* 2 Farrand 148-149, 159, 174 (multiple drafts of Article V which only allowed amendment only through states calling a constitutional convention). When Alexander Hamilton proposed allowing Congress a role in the amendment process, it was said that "There could be no danger in giving this power, as the people would finally decide in the case." *Id.* at 558.

The Government's argument would turn the convention's decision on its head. Its interpretation of Article V would allow Congress to create arbitrary modes not only for its own amendments, but also for amendments proposed by a constitutional convention. Under the government's theory, Congress could effectively nullify a convention by adopting an arbitrarily short deadline for the ratification of any amendment proposed by that convention. This power stand in stark

contrast with Article V's mandatory language: "Congress… *shall* call a Convention". U.S. Const. Art. V. (emphasis added).

This Congressional veto power flies in the face of the arguments that persuaded the states to ratify the original Constitution. Most anti-federalist opposition focused on the lack of a Bill of Rights in the constitutional text. 1 Joseph Story, Commentaries on the Constitution of the United States 191-205 (1833). At the Massachusetts ratifying convention, prominent anti-federalist Charles Jarvis explained his vote to ratify the Constitution by referring to Article V as "an adequate provision for all the purposes of political reformation," because of the control it afforded states over the national government. 6 The Documentary History of the Ratification of the Constitution ("DHRC") 1374 (Jensen & Kaminski eds.), available at https://digital.library.wisc.edu/1711.dl/Constitution.

As Governor Greg Abbott has adroitly explained, "[w]henever the Anti-Federalists criticized the [Constitution] and urged a vote against ratification, the Federalists relied on Article V as their trump card." Greg Abbott, The Myths and Realities of Article V, 21 Tex. Rev. L. & Pol. 1, 13 (2016). Federalists emphasized the constitutional convention's "primary

role in the Article V process—a particularly powerful retort given that the principal source of Anti-Federalists' criticisms was that the Constitution did too little to protect states' rights.". *Id.* at 14. One Federalist essay responded to anti-federalist concerns "that no alteration will ever be affected" in the Constitution because "the necessary concurrence of opinion will invariably be wanting" by noting that "the citizens of this Commonwealth are only permitted at a given time to revise their Constitution and then only if two thirds are agreed; but in the other case, the citizens of the United States can do it, *without any limitation of time*." 4 DHRC 180-182 (emphasis added).[10]

Holding that Congress can nullify a constitutional convention by adding ratification conditions to amendments would run counter to universal founding-era understandings of Article V.

2. Founding-era evidence also proves that the Framers made a conscious decision *not* to include a timeline for the ratification of amendments. By the time of the Constitutional Convention, "there

---

[10] *See also* 20 DHRC at 1143 ("if three fourths of the state legislatures or conventions approve such proposed amendments, they become an actual and binding part of the constitution, without any possible interference of Congress.") (Tench Coxe, Pennsylvania); Federalist No. 85 (Hamilton) ("Nothing in this particular is left to the discretion of [Congress].")

developed an idea that was peculiarly American, an idea that an instrument of government should make provision for its orderly amendment." Ralph Martig, Amending the Constitution, 35 Mich. L. Rev. 1253, 1253 (1937). Eight state constitutions made provision for orderly amendment. *Id.* at 1254. Of those eight constitutions, six had express time limits on all or part of the amendment process.[11]

These constitutions are evidence that "[t]he Framers could have done it differently" but chose not to. *Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020). The fact that no language made it from state constitutions into the federal Constitution demonstrates that the framers made a conscious decision not to incorporate known deadline procedures. This Court should not impute to Congress a power to impose ratification conditions that the Framers knowingly left out from the Constitution.

3. The government points to exactly one founding-era source to support its position: the Bill of Rights allows states "to ratify the proposed amendments individually or as a group" by including the words "all or

---

[11] Pa. Const. of 1776, § 47 (two years); Vt. Const. of 1786, ch. 2, XL (within two years of proposal by a body convened every seven years); Md. Const. of 1776, LIX (one legislative session); N.H. Const. of 1784, pt. 2; Mass. Const. of 1780, pt. 2, ch. 6, art. X; S.C. Const. of 1778, XLIV.

any" in the preamble. Appellees' Brief at 17; 1 Stat. 97. This example lends no support for the government's broad theory that Congress can impose procedural requirements on the Amendment process. Rather, the phrase tracks the language of Article V, which allows Congress to propose "Amendments"—plural. U.S. Const. Art. V.

Adding the phrase "all or any" merely signals to the states that Congress was exercising its power to propose multiple independent amendments, instead of a single amendment with twelve articles. The Constitution grants both powers. *See* 1 U.S.C. §1 ("words importing the plural include the singular" and vice versa). The phrase also mirrors the customary text indicating that an amendment has been approved by "two-thirds of both Houses concurring", making clear each amendment had been individually approved by Congress.

Most critical to this case, nothing in the phrase "all or any" purported to restrict the powers of the states when ratifying Amendments. The government has not presented any analysis— contemporaneous or otherwise—about why that language was added to the Bill of Rights, or what it signifies. A single isolated act is "surely too slender a reed on which to hang a historical tradition of restricting the

right" of states to ratify amendments as they please. *New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843, 56 (U.S. Jun. 23, 2022).

## C. Tradition Contradicts a Congressional Deadline-Setting Power

1. Between 1790 and 1960, Congress proposed twenty-seven amendments to the Constitution. None imposed unilateral constraints on when states could ratify proposed constitutional amendments. The only ratification condition was that ratification had to be conducted by either state legislatures or state conventions as directed by Congress.[12] "That prolonged reticence" to condition ratifications "would be amazing if such interference were not understood to be constitutionally proscribed." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995). *See*

---

[12] 1 Stat. 97 (1789) (Bill of Rights, unratified apportionment amendment, 27th Amendment); 1 Stat. 402 (1794) (Eleventh Amendment); 2 Stat. 306 (1803) (Twelfth Amendment); 2 Stat. 613 (1810) (unratified titles of nobility amendment); 12 Stat. 251 (1861) (Corwin Amendment); 13 Stat. 567 (1865) (Thirteenth Amendment); 14 Stat. 358 (1866) (Fourteenth Amendment); 15 Stat. 346 (1869) (Fifteenth Amendment); 36 Stat. 184 (1909) (Sixteenth Amendment); 37 Stat. 646 (1912) (Seventeenth Amendment); 40 Stat. 1050 (1917) (Eighteenth Amendment); 41 Stat. 362 (1919) (Nineteenth Amendment); 43 Stat. 670 (1924) (unratified child labor amendment); 47 Stat. 745 (1932) (Twentieth Amendment); 48 Stat. 1749 (1933) (Twenty-First Amendment); 61 Stat. 959 (1947) (Twenty-Second Amendment)

*also Free Enterprise Fund v. Public Company*, 561 U.S. 477, 505 (2010) ("the most telling indication of" a "severe constitutional problem with" an assertion of federal authority "is the lack of historical precedent").

Far from "established practice", placing limits on state ratifications in the prefatory text of Amendments was a contested and promptly rejected historical aberration. Only the twenty-third through twenty-sixth amendments, proposed over a period of under twelve years, included purportedly binding deadlines in the prefatory text only. When it came time to write the D.C. Congressional Representation amendment, Congress returned to including deadlines in the text of amendments because "placing this time limit in the text of the amendment prohibits subsequent Congresses from deciding to extend the period of time allowed for ratification… If more time is needed, the provision would be resubmitted". H.R. Rep. No. 95-886 at 7 (1978). This House report and other legislative statements[13] prove that the government is incorrect

---

[13] See 75 Cong. Rec. 3856 (1932) (Rep. Jeffers) (Proposed Deadline "would be of no avail, as he is offering it as a part of the proposal clause and not as a part of the proposed constitutional amendment."); *Id.* at 3857 (Rep Ramseyer) (moving to strike the proposed amendment because "we should play safe"); *Ibid.* (Rep. Celler) (Withdrawing the proposed amendment); 101 Cong. Rec. 6628 (1955) (Senator Russell) (stating that preliminary deadline is a "departure from any draftsmanship I have ever

when it says that "Members of Congress did not ascribe any substantive difference to the two types of deadlines". Appellees' Brief at 16.

Considering its short pedigree and controversial status, the proposing clause deadlines are not one of those traditions which has "liquidated and ascertained" the meaning of an uncertain constitutional provision. *See* Federalist No. 37 (Madison). The Supreme Court has typically considered traditions spanning "our whole experience as a Nation" to determine if a constitutional provision has been liquidated. *Chiafalo*, 140 S. Ct. at 2326 (citing *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014)); *see also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) (citing "more than 400 bills and resolutions" dating back to before the Lincoln presidency). Even *Dames Moore v. Regan*, 453 U.S. 654 (1981), a case limited to when "the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute" relied on a tradition spanning over thirty years which was never

---

seen in the case of constitutional amendments" and that he is "always concerned about submitting proposed amendments to the Constitution unless there is some definite date which will determine whether or not the amendmente is to be approved"); 116 Cong. Rec. 35959 (1970) (Senator Cook) (Expiry of a seven year deadline "would not vitiate" a constitutional amendment.)

repudiated by Congress. *Id.* at 688. The twelve-year practice of including deadlines in the proposing clauses of Constitutional amendments comes nowhere near the standard for liquidation.

2. Contrary to the government's suggestion, the ERA does not slot into the history surrounding the 18th, 20th, 21st, and 22nd Amendments. Those amendments contained a clause rendering them inoperative if ratified more than seven years after proposal. However, unlike the ERA's deadline, none of these deadlines had independent legal force. Instead, they operated because, "[h]ad the amendment been ratified in its eighth year, a good case could indeed be made that it then would have become "valid." … the "valid" amendment would be substantively meaningless— moot, inert, self-negating, of no 'operative' significance." Akhil Amar, *America's Constitution* 417-19 (2006).

A ratified amendment with a textual deadline would have become part of the Constitution, and then immediately amended the constitution so that instead of having legal effect, the amendment remained legally inoperative. The O.L.C. has explicitly endorsed this theory in the context of §3 of the ERA, which delayed the effective date of the ERA by two years upon its ratification. *See Ratification of the ERA, 44 O.L.C. at 22.*

("Including the two-year delay in the amendment itself could be necessary to amend the effect that Article V would otherwise have on the amendment's effective date."); *see also* U.S. Const. Amend. XX §5 (delayed effective date).

3. The government is wrong to suggest that every constitutional amendment showcases a general tradition of "placing ratification conditions" before the operative language of an amendment. Appellees' Brief at 17. "A court must be careful not to read a principle at such a high level of generality that it waters" down the constitution's test. *United States v. Rahimi*, No. 22-915, 63 (Barrett, J., Concurring). It is senseless to define the relevant tradition as including all "ratification conditions" when the only such conditions in any of the first twenty-seven proposed amendments are the two explicitly mentioned in the text of Article V: ratification by the states, or ratification by conventions.[14]

## D. Precedent Does Not Support a Congressional Deadline-Setting Power

---

[14] The government is correct that Congress may propose the "mode of ratification" in the prefatory text; as explained above, the phrase "mode of ratification" unambiguously excludes a ratification deadline.

1. The government relies almost exclusively on *Dillon v. Gloss* to defend the deadline. *Dillon* involved a citizen convicted of violating the Volstead Act. On appeal, Dillon argued that "The Eighteenth Amendment is invalid because of the extra-constitutional provision of the third section." *Dillon*, 256 U.S. 369 (argument of Dillon's attorneys). Dillon believed that "speed with which the amendment was disposed of by the state legislatures tends to establish the absence of deliberation", demonstrating the unconstitutionality of the deadline. *Id.* at 370.

The Court concluded that Dillon's challenge to §3 of the 18th Amendment failed because Article V "invest[s] Congress with a wide range of power in proposing amendments", limited only by "a provision long since expired", "approval of two-thirds of both houses", and the ban on amendments which would destroy equality in the Senate. *Id.* at 373-374. The Court noted that the framers had voted down additional restrictions on Article V and evidently inferred that the explicit restrictions were the only restrictions on the power to propose amendments. Id. at n.1b. Subject to these limited constraints, "A proposed constitutional amendment … can say just about anything Congress desires." Michael S. Paulsen, A General Theory of Article V:

The Constitutional Lessons of the Twenty-Seventh Amendment, 103 Yale L.J. 677, 687 (1993).

This holding of *Dillon* was sufficient by itself to resolve Dillon's challenge to §3 of the 18th Amendment. Dillon had mounted a substantive attack to the terms of the Amendment, and the Court's holding foreclosed any substantive attack that did not invoke the irrelevant senate suffrage clause.

Although this holding was sufficient to decide the case, the *Dillon* Court went on to additionally write in dicta that ratification requires "sufficiently contemporaneous" action by the states. *Dillon*, 256 U.S.. at 375. The court reached this conclusion because "in the other view is considered…four amendments proposed long ago — two in 1789, one in 1810 and one in 1861 — are still pending", a view that the Court found "quite untenable". *Ibid.* Because of its belief that the Constitution required contemporaneous ratification, the Court found that Congress had the power to fix a specific time for ratification so that "speculation on what is a reasonable time may be avoided". *Id.* at 377. Only then did the court write that "Congress may determine" the time to ratify "as an incident of its power to designate the mode of ratification." *Ibid.*

The government seizes on this sentence as the foundation of its argument. Defendants claim that any power "incident" to the power to designate the mode of ratification must be exercised in the same manner that the mode of ratification is selected. Because the mode of ratification is always selected in the prefatory text, the government argues that a deadline can be outside the constitutional text as well. This argument fails for two main reasons.

2. Everything in *Dillon* after its discussion of the substantive limitations on amendments is "[a] passage unnecessary to the outcome" that "cannot bind future courts." *Torres v. Madrid*, 141 S. Ct. 989, 1005 (2021). Once the court had held that Article V imposed no substantive constraints on amendments beyond equality of representation in the Senate, Mr. Dillon's appeal was doomed. Any statements made by the court after that point, particularly statements relating to the mode of ratification, were irrelevant. Relevant to this case, the Court received "little or no adversarial testing" on whether a deadline to propose amendments was part of the substance of a proposal or a matter of procedure. *Ibid.* "Fewer things could be less humble than insisting" that the untested and unreasoned use of the word "mode" "constitutes a rule

forever binding a Nation of over 300 million people", particularly when such a rule clearly contradicts the Constitution's text, history, and tradition. *Ibid*.

While "considered" Supreme Court dicta is entitled to due deference, the drive-by reference to the "mode of ratification" in an opinion about the substantive limits of the Amendment power was clearly not considered through adversarial testing. It does not "serve[] as a prophecy of what that Court might hold." *McCalla v. Royal MacCabees Life Ins. Co.*, 369 F.3d 1128, 1132 (9th Cir.2004).[15]

The government invokes *United States v. Sprague* 282 U.S. 716, (1931) to give more weight to *Dillon*'s dicta. While *Sprague* did claim that certain dicta was "carefully examined", that dicta was in support of the proposition that "the choice of mode rests solely in the discretion of Congress." *Sprague*, 282 U.S. at 733. The Court gathered support for that statement because the respondents in *Sprague* claimed that certain amendments could *only* by ratified by convention *Id*. at 729. *Sprague* says

---

[15] Even if *Dillon* was "considered" dicta, "we are not bound by Supreme Court dicta 'should more complete argument demonstrate that the dicta is not correct.'" *United States v. Pollard*, 20 F.4th 1252, 1261 (9th Cir. 2021) (Nelson, J., Concurring).

nothing about whether the dicta relating to the deadline was carefully considered.

3. Next, the Government cites two statements from the plurality opinion in *Coleman v. Miller* 307 U.S. 433 (1939). The plurality wrote that in *Dillon* "we sustained the action of Congress in providing *in the proposed 18th Amendment* that it should be inoperative unless ratified within seven years". *Coleman*, 307 U.S. at 452 (plurality op.) (emphasis added). This statement confirms that *Dillon* had a holding, but it adds nothing to the government's argument because the Court only wrote about proposed deadlines "in" the proposal, not deadlines outside of the proposal as would be relevant to this case.

The government acknowledges this difference in phraseology when it brings up the next line in *Coleman*, which noted that the proposed Child Labor Amendment contained "no limitation of time…either in the proposed amendment or in the resolution of submission". *Ibid*. The government claims that mentioning a potential deadline "in the amendment" or "in the resolution of submission" supports the inference that a deadline in either would have been effective. It is unclear why the government believes this. The only case *Coleman* cites for the

enforceability of deadlines is *Dillon*, but it makes clear that *Dillon* applies only to deadlines "in" an amendment. The *Coleman* court may have mentioned hypothetical (yet to be created) deadlines in proposing resolutions only to make clear that there was no Congressional guidance available to the court to decide what constituted a "reasonable" timeframe to ratify the Child Labor Amendment.

Even if *Coleman* plurality had something to say about the validity of the ERA, there are good reasons to not rely on its opinion. *Coleman* has been powerfully criticized for its procedural irregularities and mathematically impossible vote totals on certain issues. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 857 (2015) (Scalia, J., Dissenting). The Supreme Court has explicitly limited its precedential force to an arcane question of legislative standing. *Raines v. Byrd*, 521 U.S. 811, 823 (1997). Instead of untangling the Gordian Knot of precedent that is *Coleman*, this Court should look to authorities which directly support a side in this case.

4. *Dillon*'s rationale is unpersuasive for another reason: it has been repudiated by the ratification of the 27th Amendment. The reason *Dillon* includes dicta about deadline powers is because the *Dillon* Court

assumed that the Constitution imposed a mandatory "contemporaneous ratification" requirement. *Dillon*, 256 U.S. at 375. *Dillon* expressly contrasts its dicta with the opposing notion that "four amendments proposed long ago… are still pending". *Ibid.* Of course, we now know that the 27th Amendment was still pending when *Dillon* was written and would remain pending for almost 91 years before its ratification in 1992. There is no way to reconcile the undisputed validity of the 27th Amendment with the second half of *Dillon*.

If this court recognizes *Dillon*'s statements about incidental power as dicta, then the 27th Amendment proves that it was ill-considered and should be rejected. Even if *Dillon*'s claim about Congressional power incident to the mode of ratification were a full-fledged holding of the Supreme Court (it isn't), repudiation by the 27th Amendment is a legal event which "provides reason to hesitate before extending" precedent into "a new context". *Egbert v. Boule*, 142 S. Ct. 1793, 1804 (2022). Whatever framework this Court uses, it should confine *Dillon* to its facts, which involved a textual ratification deadline and not a unilateral, mutable, deadline in the prefatory text of an amendment.

5. Defendants speculate that the Supreme Court's *Munsingwear* vacatur in *N.O.W. v. Idaho* 459 U.S. 809 (1982) necessarily that the ERA had permanently failed to pass. Defendant's citation turns *Munsingwear* on its head. The doctrine exists specifically "to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." *United States v. Munsingwear*, 340 U.S. 36, 41 (1950). The Supreme Court has explicitly stated that post-certiorari dismissals for mootness "do not themselves have any legal significance" *Wisconsin Dept. of Revenue v. Wrigley Co.*, 505 U.S. 214, 221 (1992). *Mandel v. Bradley*, 432 U.S. 173 (1977) concerns only the narrow legal effect of summary *affirmances* for precedential purposes; the decision has nothing to do with *Munsingwear* vacaturs.

In any event, the Court probably did not dismiss *N.O.W.* because it thought that the ERA was completely extinguished. As evinced by its "stay" of the district court's declaratory judgment, the Court was likely concerned with the specific relief demanded by Idaho in its complaint, namely a declaration that the ERA extension was unlawful and justified recission of its ratification. Once the extension expired, the injury caused by the *extension* was moot, even if it was still possible to ratify the ERA.

The Court's citation to the Solicitor General's suggestion of mootness means nothing, as the government was the only party which filed a suggestion of mootness.[16]

## CONCLUSION

The judgment of the district court should be vacated, and the case remanded for further proceedings.

Date: Monday, July 1, 2024

<div style="margin-left:40%">

Vikram Valame
*/s/ Vikram Valame*
Pro Se

</div>

---

[16] Reliance on *N.O.W. v. Idaho* is inappropriate because many of the materials in that case—including the petition for certiorari and district court pleadings—are not publicly available.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 24-369**

I am the attorney or **self-represented party.**

**This brief contains <u>6984</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature <u>s/Vikram Valame</u>**                    **Date 07/01/2024**